OPINION
{¶ 1} Appellant, SWA, Inc., appeals from a judgment of the director of the Ohio Department of Health ("ODH") granting the certificate of need ("CON") application of appellee, Middleburg-Legacy Place, LLC, doing business as Parkside Villa ("Parkside Villa"). Because the director's decision is supported by reliable, probative and substantial evidence and is in accordance with law, we affirm.
 {¶ 2} Parkside Villa originally opened in October 2001 as a 107-bed skilled nursing home with a 30-bed assisted living unit in Middleburg Heights, Cuyahoga County. Legacy Health Services, Inc. ("Legacy") manages Parkside Villa, in addition to several other facilities. On June 13, 2003, Parkside Villa filed a CON application seeking to transfer 36 nursing home beds to its location in Middleburg Heights. The director of ODH declared the CON application complete on July 17, 2003. Because no objections were filed within the allotted time frame, the director granted the CON on October 15, 2003. Parkside Villa fully paid $17,000 for each of the 36 beds at issue and put the beds into service on December 5, 2003. Pursuant to R.C. 3702.60(B), appellant filed a notice of appeal to the director and requested an adjudication hearing on the director's decision. A hearing was conducted on February 2, 2004 through February 5, 2004, and on April 20, 2004. As a result of the hearing, the hearing examiner issued a decision recommending that the application be granted. The director adopted the hearing examiner's recommendation.
 {¶ 3} Appellant appeals, assigning the following errors:
1) The Director of ODH erred as a matter of law in refusing to consider evidence of Parkside Villa's most recent survey deficiencies and resulting sanctions.
2) The Director of ODH erred as a matter of law in refusing to consider all of the evidence presented after his initial decision on the application, placing improper weight on his initial decision and depriving SWA of its due process rights to a fair and meaningful opportunity to be heard.
3) The Director's findings and conclusions do not support the ultimate decision to award a CON to Parkside Villa and therefore the Director's CON award is not supported by reliable, probative and substantial evidence and is not in accordance with law.
 {¶ 4} Appellant's first assignment of error contends the director of ODH erred as a matter of law in refusing to consider evidence of Parkside Villa's most recent survey deficiencies and resulting sanctions.
 {¶ 5} Nursing homes in Ohio are subject to annual certification surveys, as well as surveys in response to resident complaints, if any. The survey may result in some form of citations for "deficiencies" related to patient care. Based on those deficiencies, the facility is required to file and implement a plan of correction with ODH outlining the steps the facility will take to remedy the deficiency. For more severe deficiencies, ODH may impose a civil monetary penalty ("CMP") against the facility and, in rare instances, may order the facility closed or revoke its license.
 {¶ 6} Pursuant to Section 488.404(a), Title 42, C.F.R., the centers for Medicare and Medicaid services ("CMS"), as well as the state survey agency, here ODH, are required to determine the seriousness of deficiencies when conducting a survey. To determine the appropriate remedy for a facility's noncompliance, the agency considers whether actual harm was involved, and, if applicable, whether the harm constitutes immediate jeopardy to resident health or safety. Immediate jeopardy is defined as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause serious injury, harm, impairment, or death to a resident." Section 488.301, Title 42, C.F.R. The agency also considers whether the deficiencies are isolated, constitute a pattern, or are widespread. A level "G" deficiency signifies an incident with actual harm to a resident, but with no immediate jeopardy to residents.
 {¶ 7} Ohio Adm. Code 3701-12-23(H) provides that, "[i]n reviewing a certificate of need application under this rule, the director may examine and consider * * * any state or federal records relating to the licensure * * * of any long-term care facility to which the application relates, or by any principal participant * * * in an entity which is or will be the applicant, owner, or operator," including "a list of all relevant long-term care facilities with dates of ownership, operation, or management." The director "may deny the certificate of need if the records reveal that a relevant long-term care facility's license has been revoked or its certification involuntarily denied, terminated, or not renewed, that a state licensing, survey, or medicaid agency or the United States department of health and human services has issued a written notice proposing to take such an action or has imposed other sanctions, or that the facility has or had serious deficiencies that jeopardize the life, health, safety, or welfare of the residents or seriously limit the facility's capacity to provide adequate care, particularly if governmental action was based upon repeated citation of the same or similar deficiencies." Ohio Adm. Code 3701-12-23(H)(1).
 {¶ 8} In May 2002, Parkside Villa received a CMP for a level "G" deficiency because a Parkside Villa employee shoved a patient's wheelchair, resulting in the patient sustaining two broken foot bones. Catherine Henderson, Parkside Villa's administrator at the time of the hearing, testified that Parkside Villa self-reported the incident to CMS, and a complaint investigation followed. A penalty in the amount of $2,500 was imposed, but, because Parkside Villa waived its right to a hearing, the amount was reduced to $1,625. Parkside Villa conducted an investigation into the incident and terminated the employee involved. In addition to the 2002 CMP imposed against Parkside Villa, the director found that Legacy-managed facilities received a total of ten level "G" deficiencies.
 {¶ 9} On April 29, 2004, nine days after the last day of the hearing in this proceeding, ODH conducted a survey where a second CMP was imposed against Parkside Villa for a level "G" deficiency. Appellant filed a motion to supplement the record with said information; the motion was denied. The director found the information irrelevant to an appeal of his October 15, 2003 decision granting the CON.
 {¶ 10} R.C. 119.09 provides that the agency may order additional testimony to be taken or may permit the introduction of further documentary evidence. "The decision to order [or permit] additional evidence, under R.C. 119.09, is a discretionary act on the part of the agency." In re 138 Mazal Health Care, Ltd. (1997), 117 Ohio App.3d 679, citing Arnett v. Ohio State Racing Comm. (Apr. 19, 1984), Franklin App. No. 83AP-721. An abuse of discretion connotes more than just an error in judgment; rather, it suggests unreasonable, arbitrary or unconscionable conduct. Boston v. Parks-Boston, Franklin App. No. 02AP-1031, 2003-Ohio-4263.
 {¶ 11} Appellant contends the director abused his discretion because the information not only is relevant, but is sufficient to deny the CON because it demonstrates Parkside Villa's poor survey history jeopardizing the health, safety, and welfare of the residents. In support, appellant notes that Parkside Villa's most recent certification survey reporting nine deficiencies exceeds the state average of six. Appellant also points to the ten CMP's that have been imposed against Legacy-managed facilities, including the noted 2002 CMP against Parkside Villa. Appellant lastly notes the testimony of ODH consultant Christine Kenney, who testified she considers nine deficiencies more than minimal and opined that a facility open for less than two years with that number of deficiencies, including a CMP, does not represent good survey compliance. Kenney, however, also testified that the imposition of a single CMP upon a facility would not necessarily create a presumption of poor quality of care.
 {¶ 12} Under the relevant administrative provisions, we cannot conclude the director acted arbitrarily or unconscionably in refusing to consider the April 2004 survey results. Ohio Adm. Code 3701-12-23(H)(1) permits but does not require the director to deny an application based on governmentally imposed sanctions, even if the survey result reflects "serious deficiencies that jeopardize the life, health, safety, or welfare of the residents," which a "G" deficiency does not. The director was fully aware of and considered Parkside Villa's survey history, as well as the survey history of Legacy-managed facilities. A second CMP against Parkside Villa for a level "G" deficiency likely would not have altered the director's opinion as to the level of quality of care provided at Parkside Villa. Indeed, had the director felt the information would alter his decision, he could have and probably would have allowed the evidence.
 {¶ 13} The hearing examiner's report, adopted by the director, reflects a thorough examination of all the evidence, as well as arguments, regarding the compliance history of Parkside Villa and other Legacy-managed facilities. The director had full knowledge of the other disclosed deficiencies and governmentally imposed sanctions presented during the hearing. Given that the evidence of record, even coupled with the additional CMP, would not require the director to deny the requested CON, we cannot say the director acted arbitrarily or unconscionably in refusing to allow additional evidence. Accordingly, appellant's first assignment of error is overruled.
 {¶ 14} In the third assignment of error, appellant asserts not only that the evidence in the record does not support the decision to grant Parkside Villa's CON application, but also that the decision is not in accordance with law. With respect to factual findings, it is incumbent upon appellant to demonstrate they are not supported by reliable, probative and substantial evidence. In re Gables at Green Pastures (Dec. 2, 1999), Franklin App. No. 99AP-431. "Absent such demonstration, this court may not substitute its judgment for that of the director." Id. We note that many "conclusions of law" within the hearing examiner's report are, in essence, findings of fact.
 {¶ 15} Appellant initially challenges the director's finding that the survey history of Parkside Villa and Legacy is insufficient to deny the CON. The hearing examiner determined "[t]he level G deficiency found at Parkside Villa in May, 2002, and the nine other level G deficiencies occurring in affiliated nursing homes, do not show a facility or affiliated facilities which have or have had serious deficiencies that jeopardize the health, safety, or welfare of residents, or seriously limit the facilities' capacities to provide adequate care." (Hearing Examiner's Report, at 113.)
 {¶ 16} The hearing examiner's finding, and the director's decision premised on it, are supported by reliable, probative and substantial evidence and is in accordance with law. Prior to rendering the report and recommendation to the director, the hearing examiner considered the testimony of both Kenney and Hoffman. As appellant suggests, Hoffman testified he did not check Parkside Villa's survey history prior to recommending approval of the CON, and he admitted that, had he known about the imposition of the May 2002 CMP, it could have affected his recommendation to approve the CON. Kenney testified she did not consider Parkside Villa's survey history exemplary.
 {¶ 17} Supporting the director's determination, however, was evidence that Legacy manages Parkside Villa, as well as seven other facilities. Over the past three and one-half years, a total of ten CMP's for all of Legacy's facilities reported a level "G" deficiency; only one was imposed against Parkside Villa. Parkside Villa self-reported the incident to CMS, conducted an investigation and terminated the employee involved. While a level "G" deficiency is serious in nature because it involves physical harm to a resident, the incident at Parkside Villa was isolated; no evidence demonstrated a pattern of conduct. Moreover, the hearing examiner and director fully weighed the arguments and the evidence regarding Legacy's overall survey history. Affording due deference to ODH's resolution of evidentiary issues, we cannot say the director erred in finding that Parkside Villa's survey history is not so serious as to limit its ability to provide quality patient care.
 {¶ 18} Appellant next challenges the director's finding that Parkside Villa's failure to disclose the imposition of the 2002 CMP was unintentional. Ohio Adm. Code 3701-120-8(H) allows the director of ODH to deny a CON application if the application contains false statements the applicant knowingly made.
 {¶ 19} Item number 10.31 of the CON application inquires about the applicant's "certification" survey history, requiring the applicant to "[d]iscuss findings of the most recent certification survey for the existing facility and for all other Ohio health care facilities with similar ownership or control interest." Parkside Villa responded it "has a good survey compliance history with minimal citations." It listed Hillside Plaza as receiving a CMP in 2002 and discussed a CMP imposed in 2002 against Pleasant Lake Villa. It did not mention any CMP imposed against Parkside Villa, despite Parkside Villa's receiving a CMP in 2002. Appellant claims Parkside Villa intentionally omitted the information, and the omission is sufficient to deny the CON.
 {¶ 20} Bruce Daskal, Parkside Villa's chief executive officer, testified he was not aware of any CMP imposed against Parkside Villa. Eliav Sharvit, general counsel to Legacy, also testified that he was unaware of any CMP's imposed against Parkside Villa. Catherine Henderson, Parkside Villa's administrator at the time of the hearing, testified the facility is required to keep survey records as part of the licensure requirement. According to Henderson, the CMP imposed against Parkside Villa in May 2002 under a previous administrator, was the result of a complaint survey that followed Parkside Villa's self-reporting the incident to CMS, not a result of the annual certification survey. Henderson further testified that, because she does not report to Daskal, she did not know if Daskal was aware of the CMP.
 {¶ 21} ODH consultant Kenney testified that, if Parkside Villa received a CMP in 2002, she would expect that information to be disclosed on the application; she, however, could not determine if the information was intentionally omitted. Kenney indicated that, if ODH determined "there were intentional omissions or misinformation provided in the application, we would probably recommend denial." (Tr. 603.) Although Kenney felt Parkside Villa did not fully respond to the question, upon further questioning Kenney acknowledged question 10.31 did not specifically ask about "CMP's"; instead it addressed only the "most recent certification" survey history, and the 2002 CMP against Parkside Villa was in response to a complaint survey.
 {¶ 22} Prentice Thompson, chief operating officer of Legacy, testified he was asked to gather information regarding Parkside Villa's survey history in response to a subpoena, and he requested the information from Legacy's compliance department. Thompson informed Daskal and Sharvit, the individuals who prepared the application, that no CMP's were imposed against Parkside Villa. Thompson testified the information he received was inaccurate and resulted from a mistake within the database used to answer the specific question. As he explained, the discrepancy resulted from "[c]lerical error. We — the database, it's — obviously we manually enter the deficiencies into the database. It was a clerical error. I have no idea if it was two pages stuck together or what it was, but it was a clerical error, so now we actually scan the actual surveys in, so that, you know, when we need immediate access, we can get it, instead of trying to put through a file or rely on someone to type the deficiency in." (Tr. 690-691.) According to Thompson, had the information been in the database, it would have been included in the application. Thompson stated he was aware of the CMP when it occurred and agreed he should have double-checked the information, but stated the omission was not intentional.
 {¶ 23} Thompson's testimony, if believed, provides reliable, probative and substantial evidence to support the director's finding that Parkside Villa did not knowingly omit information concerning its survey history on its CON application. Although Thompson knew of the CMP when it occurred in 2002, he testified he did not thoroughly review the requested information when he gave it to Daskal and Sharvit and therefore did not catch the mistake. Indeed, Thompson testified he had no reason to conceal the information because he believed survey results are a matter of public record. The hearing examiner and director found Thompson's explanation of the omission credible, and we may not substitute our judgment for that of ODH.
 {¶ 24} Appellant next argues that the director erred in finding that the mistakes and omissions in Parkside Villa's CON application were insufficient grounds to deny the CON. Ohio Adm. Code 3701-12-20(A) provides that "[a]n applicant * * * shall provide sufficient information to enable the director to perform a thorough review of the application in relation to each relevant criterion * * * by completely responding to each applicable portion of the application form and attachments prescribed by the director and by attaching the necessary supporting documentation."
 {¶ 25} Appellant complains that Parkside Villa did not accurately report the number of nursing home beds at other facilities in its primary and secondary service areas and failed to list each facility in the service areas. Any discrepancy apparently arose from Parkside Villa's seeming reliance on a Medicaid cost report for bed data, as opposed to ODH's county resources report available on the website. Appellant also argues Parkside Villa failed to provide responses to various questions in the application. The hearing examiner agreed that certain errors and inconsistencies existed within the application, but concluded the omission and mistakes were not knowingly or purposely made. The hearing examiner further found that the level of imperfection within the document was "not unexpected," given the complexity and volume of the application, as well as the combined effort of individuals of varied knowledge and experience to produce the information.
 {¶ 26} As the hearing examiner explained, "[t]he notion that an omission or mistake within an application so corrupts the information provided that the Ohio Director of Health is left unable to make a considered determination is not found to be case [sic] on these facts." (Hearing Examiner's Report, at 84.) The hearing examiner acknowledged the need for a valid and legitimate application in order to determine whether a CON should be granted, and to that extent did "not excuse or dismiss the imperfections in the application * * * but the hearing examiner finds that these mistakes and omissions do not reflect an application which may not be approved pursuant to Ohio Administrative Code section3701-12-20(A) due to insufficiency of information." (Hearing Examiner's Report, at 84-85.)
 {¶ 27} In adopting the hearing examiner's reasoning, the director did not abuse his discretion. ODH consultant Hoffman testified he would not consider the omission of one or two facilities from the application a material omission, and such omission would not change his opinion as to need for the additional beds. Kenney similarly testified she would not consider an applicant's omitting a facility in the application to be a material omission. The omissions and inconsistencies between the application and various reports, such as the number of beds in the primary and secondary service areas, were fully explored through testimony and exhibits. The hearing examiner was well aware of the discrepancies in the evidence prior to making his report and recommendation to the director.
 {¶ 28} Indeed, the hearing examiner fully explained he had sufficient information to render an informed decision on Parkside Villa's application. With substantial expertise in this area, the hearing examiner noted the extensive application process and the probability of human error. Reliable, probative and substantial evidence supports the director's finding and conclusion that sufficient information was provided to properly determine the CON application, and we may not substitute our judgment for that of the director. In re Aultman Hosp.
(1992), 80 Ohio App.3d 134, 139 (stating the General Assembly provided for administrative hearings in particular fields to facilitate such matters by placing the decision on the facts with those individuals who possess the knowledge and expertise to render the appropriate decision).
 {¶ 29} Appellant then asserts the director erred in finding the project is needed; to the contrary, appellant contends no evidence supports a need for the beds that are the subject of the application. Indeed, appellant complains that, because the primary and secondary services areas have hundreds of vacant beds, the additional 36 beds are not needed. Appellant also argues that it has been adversely impacted, including an adverse impact on staffing, by the opening of Parkside Villa, a situation that will only get worse with the addition of 36 beds.
 {¶ 30} Ohio Adm. Code 3701-12-20(E) provides the director "shall consider the need that the population served or proposed to be served has for the services to be provided upon implementation of the project. In assessing the need for a project, the director shall examine: (1) [t]he current and proposed primary and secondary service areas and their corresponding population[.]" The director also is to consider the impact of the project on existing staffing levels, if applicable, and the availability of personnel resources to meet the applicant's projected requirements. Ohio Adm. Code 3701-122-0(K).
 {¶ 31} The hearing examiner found that service areas are the construct of each applicant and are not areas expressly described or defined by statute or rule. Both Hoffman and Kenney confirmed that the applicant defines its own service areas, and ODH does not challenge the applicant on the issue if the service areas otherwise seem reasonable. Here, Parkside Villa defined the primary service area to be a three-mile radius from Parkside Villa; the secondary service area was a five-mile radius from Parkside Villa. Hoffman considered Parkside Villa's service areas to be reasonable.
 {¶ 32} The hearing examiner and director made findings relating to need and impact. Specifically, they determined Ohio's total population was 11,442,741 in 2003; 228,700 were 85 years or older. The expected population growth between 2003 and 2008 was 1.29 percent. Parkside Villa's average daily census for December 2003 was 119.84, for January 2004 was 130.9, for February 2004 was 140.48, for March 2004 was 139.52, and for April 2004 was 141.36. The statistics concerning bed demand and availability were not deemed dispositive because no bed need formula exists; rather, need is to be determined within the area to be served by the proposed project and is not limited to the interests of the applicant.
 {¶ 33} The hearing examiner and director concluded relocation of beds to an existing facility has less financial impact on existing providers than does a newly constructed facility. Although Parkside Villa will need increased staffing, the hearing officer noted that educational programming is more prevalent in areas of large populations, creating a larger pool of potential staff. Similarly, even though appellant and Parkside Villa are located within one-half mile of each other and compete for the same staffing pool, and the addition of beds will increase competition for staff within the service areas, the hearing examiner concluded the additional beds did not present the type of adverse impact that would support a revocation of the CON: "The increase in competition occasioned by this relocation of thirty-six beds is incremental and presents, in relation to the competing interests of these facilities, a small increase." (Hearing Examiner's Report, at 86.)
 {¶ 34} The evidence before the hearing examiner supports his conclusions. Daskal testified he made the decision to add the 36 beds because he felt there was a strong demand for services at Parkside Villa; it operates "very, very full." (Tr. 87.) Sharvit confirmed that Parkside Villa operates at full capacity. Both Daskal and Sharvit testified to a high demand for private rooms at Parkside Villa. According to Daskal, adding 36 beds will not adversely impact good nursing homes in the service areas; he described the increase as organic growth based on proven need.
 {¶ 35} Stewart Bossel, president of appellant's facility and supervising shareholder of the day-to-day operations, did not state that Parkside Villa alone was the cause of appellant's decline in occupancy rates, but also attributed the decline in appellant's occupancy to greater use of assisted living facilities, home health care services, alternatives to nursing home services, an increase in the acuity of care needed by residents, and higher ages of the population entering nursing homes. Bossel testified appellant's facility remains profitable despite decreased occupancy rates, and further indicated appellant's occupancy rate increased from 73 percent in 2003 to 82 percent in 2004.
 {¶ 36} Hoffman testified that the majority of nursing home residents are over the age of 85 and the number of individuals in that age bracket is expanding. According to Hoffman, Parkside Villa had a higher demand for private rooms than they could handle; Parkside Villa needed more beds because "[a]pparently there are people in the community that want to use Parkside and are unable to get in." (Tr. 300.) Hoffman confirmed that, as a result of the proposed project, private patient rooms would increase from 43 beds to 67 beds, and he noted that 34 of the 36 additional beds were already occupied.
 {¶ 37} Hoffman also pointed out that older facilities are not as attractive to potential residents and often maintain lower occupancy rates. Hoffman and Kenney acknowledged that, in determining need, ODH considers other providers within the service areas and did so in this case, but Hoffman anticipated no adverse impact to other providers in the service areas. While Hoffman testified that ODH considers the ability to compete important, he also stated no "true" formula exists for relocating beds. According to Hoffman, he considered staffing issues in his review of the application and concluded that, because Cuyahoga County has a large population base, staffing would be available, even if appellant had to "compete" with Parkside Villa.
 {¶ 38} The record thus supports the hearing examiner's and director's resolution of the issue of need and adverse impact. Recognizing a number of excess beds within the primary and secondary service areas, the hearing examiner and director concluded that any adverse impact was minimal because the application concerned a relocation of 36 beds, as opposed to the opening of a new facility. Based on the testimony of Hoffman, Daskal, Sharvit, and Bossel, the hearing examiner and director did not err in finding both that sufficient need for the additional beds exists and that the impact to appellant would be minimal.
 {¶ 39} Related to the need analysis, appellant maintains the hearing examiner and director wrongly ignored Ohio Adm. Code 3701-12-20(E)(1) and, instead, determined not only that the primary and secondary service areas were not a properly defined area in which to assess need, but that need should be based on the existing need within the county.
 {¶ 40} In support, appellant points to the hearing examiner's statement that "[w]hen need is examined on a countywide basis it is difficult to see how the relocation of beds within a county should be refused due to lack of need. Such arguments, buttressed by bed to population ratios, vacant beds, and demographic trends, depend on different descriptions of smaller areas within the county. These comparisons are, however, nowhere expressed or implied by the review criteria applicable to this case. The descriptions of distinct areas within the county provide a more precise description of localized activity but offer a different picture, with a different perspective, from an entire county considered as a whole." (Hearing Examiner's Report, at 89-90.)
 {¶ 41} Contrary to appellant's assertion, the hearing examiner and director considered the number of excess beds in both the primary and secondary service areas, noting 317 vacant beds existed in the primary service area and 154 vacant beds existed in the secondary service area. They determined that bed excess did not necessarily lead to the conclusion that the CON should not be granted, as bed need is only one factor to consider in determining a CON application. The Center of Townv. Shaker Heights Care Ctr. (Oct. 4, 1990), Franklin App. No. 89AP-405.
 {¶ 42} The statute requires only consideration of the service areas and its corresponding population; it does not mandate that the director take specific action when excess beds exist. Moreover, the hearing examiner and director found the addition of 36 beds would not be a substantially adverse impact on other providers in the service areas. Rather, they concluded that the increase occasioned by the relocation of the beds was incremental and, in relation to the competing interests of the facilities, represented a small increase. Giving due deference to ODH, we cannot say the director acted contrary to law in assessing the issue of need.
 {¶ 43} Next, appellant contends the bed purchase agreement was not sufficient to execute the sale of the 36 beds. Appellant claims the record does not contain an agreement between Parkside Villa and Madonna Hall, the facility where Parkside Villa acquired 11 of the 36 beds. Instead, the only existing agreement is between Parkside Villa and Eliza Bryant Village ("Eliza Bryant").
 {¶ 44} Ohio Adm. Code 3701-12-232(B)(2) requires that "[t]he applicant or the person proposed to own or operate the replacement facility or the facility to which the beds will be relocated: * * * (2) Has entered into a contract to acquire the right to operate the facility being replaced or has acquired or entered into a contract to acquire the beds being relocated[.]" Here, Eliza Bryant became the owner and operator of Madonna Hall in July 2000 and, therefore, owned the beds located at Madonna Hall. Accordingly, the director did not err in finding sufficient evidence of a transfer of ownership from the owner/seller, Eliza Bryant, to the purchaser, Parkside Villa.
 {¶ 45} Lastly, appellant claims the notice provided to state legislators was insufficient. Ohio Adm. Code 3701-12-08(B) provides that, "[i]n the case of a construction project, the applicant shall submit a copy of the written notice that the applicant has provided to: * * * (2) The state senator and state representative for the area in which the activity will be conducted." Appellant contends the public notice was insufficient because the notice states that the beds are being transferred to Parkside Villa from Eliza Bryant rather than Madonna Hall. The director found any inaccuracy was not grounds to revoke the CON. Eliza Bryant, however, was the actual owner of the beds. The notice was in all other respects accurate in terms of the activity to be undertaken in connection with the project. Under those circumstances, we cannot say the director abused his discretion in finding the notice sufficient to apprise the state senator and representative of the activity in the area.
 {¶ 46} Because reliable, probative and substantial evidence supports the director's findings and conclusions, and the findings and conclusions are in accordance with law, we overrule appellant's third assignment of error.
 {¶ 47} Appellant's second assignment of error claims, generally, that the director did not consider the evidence from the hearing. Rather, appellant asserts the director improperly relied on his previous decision granting the CON, and thus deprived appellant of due process. Appellant's argument is without merit.
 {¶ 48} The director's order states that he took into consideration the report and recommendation of the hearing officer, the briefs, motions, and objections and replies to the report, prior to affirming the CON granted to Parkside Villa. The director fully incorporated the hearing examiner's report and recommendation and found appellant failed to prove either that the project was not needed or that the project was not in accordance with law.
 {¶ 49} The report and recommendation of the hearing examiner are replete with citations to the transcript and references to the documentary evidence presented and received. It includes the hearing examiner's specific acknowledgement that "[t]his is a de novo hearing and therefore the determination by the Ohio Director of Health to grant the certificate of need to Parkside Villa is a factual event cognizable from the record, but this initial approval does not create a presumption of legitimacy of the certificate of need for purposes of this proceeding. * * * [T]his proceeding initiates a de novo inquiry into whether the certificate of need fails to meet requirements of need and compliance with applicable review criteria." (Hearing Examiner's Report, at 95.)
 {¶ 50} Apart from appellant's assertions, nothing suggests that the hearing examiner placed undue reliance on the director's previous decision to grant the CON. In turn, the director based his decision concerning the application on the report and recommendation of the hearing examiner in accordance with R.C. 3702.52. Accordingly, appellant's second assignment of error is overruled.
 {¶ 51} Having overruled appellant's first, second, and third assignments of error, the decision of the director of the Ohio Department of Health is affirmed.
Judgment affirmed.
Brown, P.J., and French, j., concur.