[Cite as *In re LTC Tallmadge, L.L.C.*, 2019-Ohio-225.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| In the Matter of: | : | |
| LTC Tallmadge, LLC, | : | No. 18AP-282 |
| | | (ODH No. 9102-01-16A) |
| (Falls Village Retirement Community, Ltd., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on January 24, 2019

**On brief:** *Taft Stettinius & Hollister LLP, Patrick J. Krebs,* and *Jennifer B. Orr,* for appellant. **Argued:** *Jennifer B. Orr.*

**On brief:** *Rolf Goffman Martin Lang LLP, Ira S. Goffman,* and *Joseph F. Petros, III,* for appellee LTC Tallmadge, LLC. **Argued:** *Ira S. Goffman.*

**On brief:** *Michael DeWine,* Attorney General, and *Henry G. Appel,* for appellee Ohio Department of Health. **Argued:** *Henry G. Appel.*

APPEAL from the Ohio Department of Health

SADLER, J.

{¶ 1} Appellant, Falls Village Retirement Community, Ltd. ("appellant" or "Falls Village"), appeals, pursuant to R.C. 3702.60, from the March 30, 2018 adjudication order issued by appellee Director of the Ohio Department of Health ("ODH") granting the certificate of need ("CON") application filed by appellee LTC Tallmadge, LLC ("Tallmadge"). Because the order is supported by reliable, probative, and substantial evidence and is in accordance with law, we affirm the order.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}    On August 29, 2016, Tallmadge filed a CON application with ODH to develop a newly constructed nursing home facility in Tallmadge, Ohio in Summit County.  In order to do so, the application sought the relocation of 90 licensed nursing home beds ("beds") from 4 existing nursing homes to the new Tallmadge facility.  Specifically, the application called for the relocation of 20 beds from Canal Pointe Nursing and Rehabilitation Center ("Canal Pointe"), 17 beds from Summit Healthcare Management, Inc. ("Summit"), 24 beds from Sapphire Health and Rehabilitation ("Sapphire"), and 29 beds from Bath Creek Estates ("Bath Creek").  Tallmadge, in Section 10.4 of the application, stated the project is needed because of projections showing by 2021 a 14.8 percent increase in population in those 65 years of age and older, the benefit of relocating 90 "under-utilized" beds within Summit County to a "new, modern environment with state-of-the-art inpatient rehabilitation services and long-term care services" and the need for short-term skilled nursing beds in the Akron area since the closing of Summit.  (State's Ex. 1, CON Application at 37.)

{¶ 3}    Regarding land for the project, in Section 2.11 of the application, Tallmadge indicated $575,000 as the land cost, which "include[d] purchase price, due diligence, and costs related to obtained zoning approval."  (State's Ex. 1, CON Application at 7.)  Attached to the CON application is a 2015 purchase agreement for the land stating a purchase price of $325,000.

{¶ 4}    The acquisition cost for the operating rights to nursing home beds for the project, as stated in Section 5.26, is $1,125,000.  (State's Ex. 1, CON Application at 10.)  In Section 7.15, Tallmadge stated the "[v]alue of licensed beds to be contributed by owners: ($12,500 x 90)" to arrive at the figure of $1,125,000.  (State's Ex. 1, CON Application at 12.)  In the narrative portion of the CON application, in response to a question about how the beds are being acquired, Tallmadge states "[t]he Applicant owns the beds from Canal Pointe, Summit and Sapphire.  The beds from Bath Creek are owned by one of the owners of the Applicant and will be transferred to the Applicant as equity for this project."  (State's Ex. 1, CON Application at 31.)

{¶ 5}    On September 28, 2016, ODH mailed Tallmadge its first request for additional information.  As part of its response, Tallmadge provided ODH with the bills of

sale related to Canal Pointe, Summit, and Sapphire. ODH mailed Tallmadge a second request for additional information on January 4, 2017. In addition to other information, Tallmadge submitted a purchase agreement whereby Tallmadge agreed to purchase and Bath Creek agreed to sell the operating rights to 29 beds. As part of this agreement, a contingency exists whereby "Seller shall have obtained final, non-appealable approval of Seller's CON Application from the ODH for the relocation of the Replacement Beds to Seller's facility." (State's Ex. 1, Bath Creek Purchase Agreement at 243.) "Replacement Beds" refer to Bath Creek's intention to purchase 29 beds from another provider pursuant to a separate CON application. (State's Ex. 1, Bath Creek Purchase Agreement at 235.)

{¶ 6} ODH declared Tallmadge's application complete on February 14, 2017. On April 5, 2017, ODH staff submitted a memorandum to the director of ODH recommending approval of the project. On April 11, 2017, the director issued a decision approving Tallmadge's CON application. Appellant, as owner and operator of another nursing facility located in the area proposed to be served by Tallmadge's new nursing home, filed an appeal on May 4, 2017 with the director, pursuant to R.C. 3702.60(B), and requested an adjudication hearing.

{¶ 7} An adjudication hearing was held on August 29 and 30, 2017 before a hearing examiner. Appellant called Michael Francus, president of VRC Management, Inc., the manager of Falls Village. Francus testified he bought the 123,000 square foot complex in 1999, gutted it, and reopened it in 2001 as an assisted living facility with 108 licensed (104 certified) beds consisting of private rooms on the second and third floors, along with a rehabilitation tenant on the first floor, and an attached chronic dialysis unit and a medical office building. According to Francus, Falls Village is a "five-star facility" with no deficiencies as of its last survey and occupancy stood at approximately 77 percent. (Tr. at 20.) Francus testified Falls Village is located 1.82 miles from the site of the new Tallmadge development. According to Francus, bringing another facility into the service area would negatively impact Falls Village through lower occupancy rates and, in particular, staffing instability. Francus further testified, in his experience, $12,500 was a "very low" price to acquire the rights to operate a nursing home bed. (Tr. at 80.)

{¶ 8} On cross-examination, Francus testified he was challenging the need for the project, the control over the beds, and missing documentation from the application and was

not challenging the financial feasibility or design of the project. Francus testified for previous CON applications he has completed, he submitted "bill[s] of sale, among other evidence of control and ownership." (Tr. at 111.) Francus agreed, in general, changing from semi-private rooms to private rooms would be a benefit, if such conversion actually occurred. Francus also agreed, regarding the new project's impact, that residents are not the key issue since more residents will come to the service area with the right demographics, but, rather, the biggest issue the new facility would create for Falls Village is staff loss or instability.

{¶ 9} Appellant next called Russell Corwin, a certified public accountant with experience in nursing home accounting and related CON financial matters. The hearing examiner recognized Corwin as an expert witness. According to Corwin, generally, a bill of sale showing the purchase of beds from a third party is sufficient to demonstrate CON applicants possess the bed rights proposed to be relocated for a project. Corwin later testified that although he has seen applications demonstrate the acquisition of beds through a bill of sale, it is not as common as using the purchase agreement to do so and noted he could not verify the terms and purchase price of the beds without a purchase agreement. Corwin testified the $12,500 amount shown for the bed price in the CON application is a much lower price than what he has seen other beds in the county transfer for, and a more common market value within Summit County averaged around $20,000 to $25,000. According to Corwin, not including a more reasonable price for the beds impacts the application by increasing the cost of buying those beds and increasing the cost of debt service "because you would have to either borrow or put more, additional capital in at the beginning" of the project. (Tr. at 147-48.) Corwin likewise testified that $575,000 attributed to land cost was "a stretch," and he could not determine why the application stated that number rather than a land purchase price stated in public records. (Tr. at 159.) Overall, Corwin opined the CON application in this case did not include supporting documents, particularly related to the purchase of land and bed operating rights, that would make it complete. On cross-examination, Corwin agreed applicants are entitled to spend ten percent more than the CON approval amount and still comply with the CON and are permitted to deviate from specific amounts provided on line items in the application, with the exception of amounts asked for by the reviewer.

{¶ 10} Appellant called Benjamin Volpe, one of the co-owners of the Tallmadge project and the chief investment officer of Wet Rock Services, LLC, which has a management relationship with Saber Healthcare Group. Volpe testified that Tallmadge Healthcare Group is a subsidiary of Saber Healthcare Group and that Saber also owns the operating company for Bath Creek. According to Volpe, the transaction between Tallmadge and Bath Creek for 29 beds would go forward regardless of whether the separate CON application for replacement beds is approved, and Bath Creek would work to find replacement beds from another source.

{¶ 11} Appellant then called another co-owner of Tallmadge, Chad Brenner. Brenner testified he is interested in building "higher-acuity buildings," and Tallmadge was identified as an area underserved in the "rehab therapy model" in new nursing homes in Ohio. (Tr. at 211.) Brenner testified the land for the project had been purchased in October 2016 for $250,000, with a $1,000 transfer tax. According to Brenner, the original purchase agreement for the land was approximately $325,000, but issues with riparian rights, which reduced the amount of usable property, led to an adjustment downward in price at closing. Brenner testified to a "massive cost[] of investigation" in dealing with the environmental issues. (Tr. at 204.) Brenner explained the $575,000 number provided in the CON application included the purchase price as well as costs for due diligence, zoning approval, legal, environmental, site work, wetland delineation, and engineering.

{¶ 12} Regarding acquisition of beds, Brenner testified they already bought the right to operate the beds transferred from Canal Pointe, Summit, and Sapphire as demonstrated through the bills of sale. Brenner agreed the exact price for each of the beds is not provided in the CON application, and all the beds for these three facilities were not purchased for the same price, $12,500. Brenner could not recall whether a purchase agreement exists for those beds but believed the purchase was part of a gross contract on the acquisition of a facility and "might have been subsumed into that." (Tr. at 226.) Brenner testified they paid "equal to or less than what we represent them in the capital structure." (Tr. at 224.) For Sapphire, Brenner testified they "paid approximately [$10,500]" apiece for 24 beds. (Tr. at 225.) For Bath Creek, Brenner testified that he provided the purchase agreement, a valid and binding contract, to acquire 29 beds at $12,500. According to Brenner, if the CON

application is ultimately approved, the project developers and the bank are ready to move forward to complete the project.

{¶ 13} The parties submitted post-hearing briefs. On January 18, 2018, the hearing examiner issued a report recommending approval of Tallmadge's CON application. In his report, the hearing examiner found appellant had standing to bring an R.C. 3702.60(B) appeal as an "affected person" under R.C. 3702.51(M)(4). (Hearing Examiner Report & Recommendation at 49, 62.) The hearing examiner found although appellant "has shown an ambiguity in the [CON] as to assigning an acquisition value to the nursing beds needed for the proposed project * * * this ambiguity is not found sufficient to support a recommendation that the certificate of need granted to LTC Tallmadge, LLC be reversed." (Hearing Examiner Report & Recommendation at 62.) The hearing examiner then concluded appellant had failed to prove, by a preponderance of the evidence, that: appellee failed to provide sufficient information and supporting documentation to enable the director of ODH to conduct a thorough review of the CON application and proposed project; appellee did not possess ownership of the bed operating rights or failed to enter a contract to secure ownership of the bed operating rights needed for the project; the project is not needed; and the negative impact expected from the project on existing providers in the service area will be so onerous as to support a recommendation of reversal of the CON application. Considering all the above, the hearing examiner recommended to the director of ODH that the April 11, 2017 decision to grant a CON to Tallmadge be affirmed.

{¶ 14} Appellant submitted objections to the hearing examiner's report. On March 30, 2018, the director issued an adjudication order adopting the hearing examiner's decision and approving Tallmadge's CON application to develop the facility.

{¶ 15} Appellant filed a timely appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Appellant assigns the following as trial court error:

[1.] The Adjudication Order is not supported by reliable, probative, and substantial evidence and is not in accordance with the law because Appellee did not include the full cost of its Project in its CON application.

[2.] The Adjudication Order is not supported by reliable, probative, and substantial evidence and is not in accordance

with the law because Appellee lacks the legal authority to relocate the beds to the Project.

[3.] The Adjudication Order is not supported by reliable, probative, and substantial evidence and is not in accordance with the law because there is no need for Appellee's Project in [Tallmadge].[1]

[4.] The Adjudication Order is not supported by reliable, probative, and substantial evidence and is not in accordance with the law because the Director disregarded evidence of the adverse impact the Project will have on Appellant.

## III.  STANDARD OF REVIEW

{¶ 17} Pursuant to R.C. 3702.60(B), "the [CON] applicant or another affected person may appeal to the director in accordance with Chapter 119. of the Revised Code a decision issued by the director to grant or deny a certificate of need application, and the director shall provide an adjudication hearing in accordance with that chapter."  At the adjudication hearing, the appellant must prove by a preponderance of the evidence that the director's decision is not in accordance with R.C. 3702.52 through 3702.62 or rules adopted under those sections.

{¶ 18} The decision issued by the director following the adjudication hearing may be appealed to the Tenth District under R.C. 3702.60(B).  In considering an appeal of an adjudication order for a CON, this court "shall affirm the director's order if it finds, upon consideration of the entire record and any additional evidence admitted under division (F)(2) of this section, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law.  In the absence of such a finding, it must reverse, vacate, or modify the order."  R.C. 3702.60(F)(3).

{¶ 19} Reliable evidence is "dependable; that is, it can be confidently trusted.  In order to be reliable, there must be a reasonable probability that the evidence is true."  *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992).  Probative evidence is "evidence that tends to prove the issue in question; it must be relevant in

_____

[1] Appellant first identifies the subject area as "Macedonia," which we assume to be a typographical error: appellant later identifies and argues only about the need for the project in "Tallmadge."  (Appellant's Brief at vi, 36.)

determining the issue."  *Id.*  Substantial evidence is "evidence with some weight; it must have importance and value."  *Id.*

{¶ 20} The "[a]nalysis of whether the evidence supports the director's decision is essentially a question of the absence or presence of the requisite quantum of evidence."  *In re Wedgewood Health Care Ctr., LLC*, 176 Ohio App.3d 554, 2008-Ohio-2950, ¶ 7 (10th Dist.).  "Although this court may engage in a very limited weighing of the evidence upon an appeal of this nature, we may not substitute our judgment for that of the [ODH] as to the credibility of witnesses and the weight to be given the testimony."  *In re Knolls of Oxford*, 10th Dist. No. 02AP-514, 2003-Ohio-270, ¶ 13.  "A reviewing court must give due deference to the administrative resolution of evidentiary conflicts."  *In re Progressive Macedonia Real Estate, LLC*, 10th Dist. No. 16AP-71, 2017-Ohio-8374, ¶ 10, citing *In re Manor Care*, 10th Dist. No. 05AP-398, 2005-Ohio-5703, ¶ 9.  "With respect to factual findings, it is incumbent upon appellant to demonstrate they are not supported by reliable, probative, and substantial evidence."  *In re Certificate of Need Application for Parkside Villa*, 10th Dist. No. 04AP-1232, 2005-Ohio-5699, ¶ 14.

{¶ 21} " 'Courts must afford due deference to an agency's interpretation of the rules it is required to administer, but only so long as the agency's interpretation is reasonable and consistent with the plain language of the rules.' "  *In Re Certificate of Need Application of Countryside Health Care Ctr.*, 10th Dist. No. 14AP-411, 2014-Ohio-5861, ¶ 13, quoting *In re 4307 Care, L.L.C. Certificate of Need*, 10th Dist. No. 05AP-672, 2006-Ohio-2071, ¶ 12. " 'Deference to an agency's interpretation "may be disregarded or set aside when judicial construction makes it imperative to do so." ' "  *Countryside Health Care Ctr.* at ¶ 13, quoting *4307 Care* at ¶ 12, quoting *Glassco v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 03AP-871, 2004-Ohio-2168, ¶ 11.

## IV.  LEGAL ANALYSIS

### A.  Appellant's First Assignment of Error

{¶ 22} In the first assignment of error, appellant contends the adjudication order is not supported by reliable, probative, and substantial evidence and is not in accordance with law because Tallmadge violated R.C. 3702.52(B)(1) when it failed to provide complete information in its CON application regarding the full cost of the project in regard to: (1) the

cost of acquiring the rights to operate the beds; and (2) the cost of the land on which the project is to be built.  For the following reasons, we disagree.

{¶ 23}  R.C. 3702.52 gives the director of ODH the authority to administer the state CON program in accordance with R.C. 3702.51 through 3702.62 and rules adopted under those sections.  R.C. 3702.52(B)(1) states in pertinent part:

> Each application for a certificate of need shall be submitted to the director on forms and in the manner prescribed by the director. * * *
>
> Each application shall include a plan for obligating the capital expenditures or implementing the proposed project on a timely basis in accordance with section 3702.524 of the Revised Code. Each application shall also include all other information required by rules adopted under division (B) of section 3702.57 of the Revised Code.

To that end, Ohio Adm.Code 3701-12-20(A) provides:

> An applicant for a certificate of need shall provide sufficient information to enable the director to perform a thorough review of the application in relation to each relevant criterion established by this chapter of the Administrative Code by completely responding to each applicable portion of the application form and attachments prescribed by the director and by attaching the necessary supporting documentation.

{¶ 24}  Under Ohio Adm.Code 3701-12-20(A), the director of ODH is not required to disapprove a CON application with omissions, mistakes, or inconsistencies where the director has sufficient information to perform a thorough review of the application. *Parkside Villa* at ¶ 24-28; *Progressive Macedonia Real Estate* at ¶ 23.  Testimony and exhibits provided at a hearing contesting the CON application may explain deficiencies in the CON application and serve as evidence to support a finding that the director of ODH had sufficient information to properly determine the CON application.  *Parkside Villa* at ¶ 27-28; *In re Ave. at Aurora*, 10th Dist. No. 12AP-151, 2013-Ohio-1145, ¶ 36-37; *Progressive Macedonia Real Estate* at ¶ 21-23 (determining testimony provided at the administrative hearing to contest a CON application served as reliable, probative, and substantial evidence of the cost of the project and support the requirement to provide the full cost of a project in the CON application).

### 1. Cost of Beds

{¶ 25} Appellant first argues Tallmadge failed to meet its statutory duty to provide the full cost of the project in the CON application in regard to the cost of acquiring the rights to operate the beds. Appellant specifically contends he met his burden of proof by "showing that [Tallmadge] failed to provide material cost information for the acquisition of the operating rights to the beds in question that was 'expressly demanded' in line 5.26 of the CON Application, and further refused to provide the purchase agreements for those bed rights that were requested by * * * Section 10.30 of the CON Application." (Appellant's Brief at 29.) Appellant contends the three bills of sale relative to the 61 beds purchased from Canal Pointe, Summit, and Sapphire are insufficient as they did not identify the purchase price of those beds, and Tallmadge failed to otherwise provide documentation to substantiate the cost of those beds. Appellant points to Corwin's expert testimony at the hearing that the CON application was deficient and notes the hearing examiner found that the application demanded Tallmadge include the cost of acquiring the rights to operate all the beds and that Brenner testified the $1,125,000 figure reported on line 5.26 of its application as the acquisition cost for the beds was not accurate.

{¶ 26} Tallmadge counters there is no requirement that CON applicants provide documentation showing the price of each individual bed or group of beds acquired for the project. Tallmadge states it disclosed a total acquisition cost of $1,125,000, and its managing owner, Brenner, never testified that figure was inaccurate but, rather, testified the $12,500 per bed figure was the average value of each bed it already owned. Tallmadge also argues that Section 10.30 pertains to establishing ownership of the beds rather than cost of the beds and that purchase agreements are not required to be attached to the CON application in order to establish project cost for beds an applicant already owns. ODH likewise contends, based on the information provided in the CON application and Brenner's testimony, that the director had adequate information regarding the bed purchase to grant the application, and since Tallmadge already owned the beds at issue, there is no significant impact on the feasibility of the proposed project.

{¶ 27} We agree with appellees. In this case, in Section 7.15 of its CON application, Tallmadge reported $1,125,000 as the bed acquisition cost and stated how it derived that number (multiplying 90 beds by $12,500). Based on the purchase agreement for Bath

Creek setting the purchase price at $12,500, the 29 beds purchased from Bath Creek total $362,500. At the hearing contesting the CON application, although Brenner could not remember the exact price paid per bed, he testified that Tallmadge paid approximately $10,500 apiece for 24 beds at Sapphire and insisted that the purchase price for beds, overall, was $12,500 or less per bed.

{¶ 28} Appellant provides, and we find, no authority requiring the bed acquisition cost to be broken down and verified by individual bed purchase. The total bed acquisition cost provided in appellant's CON application, $1,125,000, was supported by the CON application description and Brenner's testimony about the maximum price Tallmadge paid per bed. Furthermore, as discussed by Corwin, the impact on the CON of not knowing the exact price of the beds is largely tied to the risk of increased project costs. Because Tallmadge already owned the beds at issue here, we agree with ODH that the actual cost of the right to operate the individual beds would not pose a significant risk to the viability of the proposed project.

{¶ 29} On this record, the bed cost information provided by appellant was sufficient under Ohio Adm.Code 3701-12-20(A) to permit the director to thoroughly review the project for financial feasibility. The hearing examiner did not err in finding the lack of information regarding the actual acquisition costs for beds to not be fatal to the CON granted to Tallmadge in this case. *Parkside Villa*, 2005-Ohio-5699, at ¶ 24-28. Considering all the above, we find the director's adjudication order, as it pertains to the cost to acquire the rights to operate beds, was supported by reliable, probative, and substantial evidence and is in accordance with law.

### 2. Cost of Land

{¶ 30} Appellant next contends Tallmadge failed to provide sufficient information to enable the director to perform a thorough review of the application under Ohio Adm.Code 3701-12-20(A) by not properly identifying the land cost. Appellant notes the real estate purchase agreement submitted by Tallmadge, the price testified to by Brenner, and the CON application all offer differing figures for the cost of the land. Appellant also believes the hearing examiner improperly relied on an "unsubstantiated 'notation' " accompanying the land cost number provided in the CON application. (Appellant's Brief at 30.)

{¶ 31} In response, Tallmadge argues that appellant ignores Brenner's testimony explaining the various figures and supporting the accuracy of the number provided in the CON application. ODH similarly argues that appellant fails to show the information provided is incorrect or insufficient and notes that under this court's precedent, ODH is permitted to allow applicants to update and correct its application.

{¶ 32} Here, the 2015 purchase agreement attached to the CON application shows an agreement to pay $325,000 for the land. In Section 2.11 of the CON application, Tallmadge identifies the "[l]and cost" as $575,000 with a note stating this figure includes the purchase price, due diligence, and costs related to obtaining zoning approval. (State's Ex. 1, CON Application at 7.)

{¶ 33} At the hearing, Tallmadge provided an exhibit and testimony showing the land ended up closing for $250,000 after engineering studies concluded a portion of the land could not be developed and the parties renegotiated the purchase price. Brenner also testified to the extensive cost of investigation into the property due to environmental issues and explained the $575,000 number provided in the CON application included the purchase price as well as costs for due diligence, zoning approval, legal, environmental, site work, wetland delineation, and engineering. The hearing examiner found the record contained information as to the purchase price for the land and that the purchase price was renegotiated due to circumstances beyond the control of the parties to the land transaction.

{¶ 34} As noted by ODH, applicants are permitted to update and explain the information in their CON applications and such exhibits and testimony may serve as evidence to support the director of ODH's finding that sufficient information was provided to properly determine the CON application. *Parkside Villa* at ¶ 27-28; *Ave. at Aurora* at ¶ 36-37. After review of the record, we find the director's adjudication order, as it pertains to the cost of purchasing the land for the project, was supported by reliable, probative, and substantial evidence and is in accordance with law.

{¶ 35} Accordingly, we overrule appellant's first assignment of error.

**B. Appellant's Second Assignment of Error**

{¶ 36} In the second assignment of error, appellant contends the adjudication order was not supported by reliable, probative, and substantial evidence and is not in accordance with law because Tallmadge did not establish ownership of the 90 nursing home beds and

therefore lacks the legal authority to relocate the beds under Ohio Adm.Code 3701-12-23.2(B). For the following reasons, we disagree.

{¶ 37} Ohio Adm.Code 3701-12-23.2, which pertains to replacement of long-term care facilities and relocation of long-term care beds, reads in pertinent part:

> Applications submitted for a certificate of need to replace an existing long-term care facility or to relocate existing long-term care beds from one site to another must meet the following criteria:
>
> (1) The applicant or the person proposed to own or operate the facility must have the legal authority to operate the long-term care beds that are subject to the certificate of need; or
>
> (2) The applicant or the person proposed to own or operate the facility must have entered into a contract to obtain the legal authority to operate the beds that are subject to the certificate of need.

Ohio Adm.Code 3701-12-23.2(B).

{¶ 38} In this case, the hearing examiner found evidence in the record that "it is commonly and typically the case that the demonstration of ownership of bed operating rights is shown through a bill of sale." (Hearing Examiner Report & Recommendation at 51.) Therefore, the hearing examiner found the three bills of sale provided for Canal Pointe, Summit, and Sapphire sufficient to indicate Tallmadge's ownership of bed operating rights, as required by Ohio Adm.Code 3701-12-23.2(B)(1). The hearing examiner additionally found that contingencies in the contract between Tallmadge and Bath Creek related to CON authority for replacement beds at the Bath Creek facility did not result in noncompliance with Ohio Adm.Code 3701-12-23.2(B)(2).

{¶ 39} Appellant argues that purchase agreements are "necessary supporting documentation" under Ohio Adm.Code 3701-12-23.2(B), and, as such, Tallmadge was required to provide the purchase agreements, rather than merely bills of sale, for the beds at Canal Pointe, Summit, and Sapphire to demonstrate ownership of those beds. (Appellant's Brief at 33.) Appellant notes the bills of sale Tallmadge submitted are dated after Tallmadge filed the CON application. Appellant also argues the purchase agreement Tallmadge provided for the beds at Bath Creek is deficient under Ohio Adm.Code 3701-12-

23.2(B) since the sale of those beds is contingent on approval of a separate CON application involving replacement beds Bath Creek intends to secure from another facility.

{¶ 40} Tallmadge contends the plain language of Ohio Adm.Code 3701-12-23.2(B) allows an applicant to show either that it already has the legal right to operate the beds, which bills of sale demonstrate, or that it has entered into a contract for the legal right to operate the beds. Tallmadge notes that it was permitted to supplement its application and that the bills of sale were executed prior to ODH issuing its notice of completeness. Tallmadge also contends Ohio Adm.Code 3701-12-23.2(B)(2) does not forbid contingencies, a proposition supported by *4307 Care*, 2006-Ohio-2071, a case in which this court found a bed rights contract with a consent clause, which ultimately may not be enforceable, to nonetheless be sufficient to satisfy Ohio Adm.Code 3701-12-23.2(B)(2). ODH likewise contends that Tallmadge demonstrated it owned the 61 beds relocated from Canal Pointe, Summit, and Sapphire through the bills of sale and fulfilled its requirement to show it had entered into a contract to obtain legal authority to operate the 29 beds from Bath Creek by providing the purchase agreement for those beds, regardless of the contingency within it. ODH urges this court to not add words to an unambiguous rule.

{¶ 41} We agree with appellees. Ohio Adm.Code 3701-12-23.2(B) plainly requires applicants for a CON to either have legal authority to operate the beds subject to the CON or have entered into a contract to obtain legal authority to operate the beds subject to the CON. We first recognize that ODH has interpreted its own rule to find the bills of sale submitted by Tallmadge satisfied Ohio Adm.Code 3701-12-23.2(B)(1), and the purchase agreement between Tallmadge and Bath Creek complied with Ohio Adm.Code 3701-12-23.2(B)(2). We find the agency's interpretation reasonable and consistent with the plain language of the rule and, therefore, afford deference to its interpretation of the rules it is required to administer. *Countryside Health Care Ctr.*, 2014-Ohio-5681, at ¶ 13; *4307 Care* at ¶ 12.

{¶ 42} Furthermore, regarding Ohio Adm.Code 3701-12-23.2(B)(1), appellant provides, and we find, no authority for the proposition that bills of sale do not serve as proof of legal authority to operate beds subject to a CON. Appellant's own expert witness, Corwin, testified that bills of sale are typically the way applicants for a CON demonstrate their possession of bed rights in connection with a project. Francus also testified that a bill of

sale evidences control and ownership of beds. Regarding Ohio Adm.Code 3701-12-23.2(B)(2), appellant likewise provides, and we find, no authority for the proposition that purchase agreements containing contingencies do not serve as proof an applicant has entered into a contract to obtain legal authority to operate the beds subject to the CON. The language of Ohio Adm.Code 3701-12-23.2(B)(2) does not make such distinction.

{¶ 43} Considering all the above, we find the hearing examiner did not err in concluding Tallmadge demonstrated that it already owns the beds for Canal Pointe, Summit, and Sapphire under Ohio Adm.Code 3701-12-23.2(B)(1) and that it has entered into a contract to obtain the legal authority to operate the beds for Bath Creek under Ohio Adm.Code 3701-12-23.2(B)(2). After review of the record, we find the director's adjudication order, as it pertains to ownership of the right to operate beds, was supported by reliable, probative, and substantial evidence and is in accordance with law.

{¶ 44} Accordingly, we overrule appellant's second assignment of error.

### C. Appellant's Third Assignment of Error

{¶ 45} In the third assignment of error, appellant contends the adjudication order is not supported by reliable, probative, and substantial evidence and is not in accordance with law because there is no need for the Tallmadge project and, therefore, should have been denied pursuant to Ohio Adm.Code 3701-12-20(D). For the following reasons, we disagree.

{¶ 46} Pursuant to Ohio Adm.Code 3701-12-20(D):

> The director shall consider the need that the population served or proposed to be served has for the services to be provided upon implementation of the project. In assessing the need for a project, the director shall examine:
>
> (1) The current and proposed primary and secondary service areas and their corresponding population;
>
> (2) Travel times and the accessibility of the project site and of the sites of similar services to the proposed service area population;
>
> (3) Current and projected patient origin data, by zip code;
>
> (4) Any special needs and circumstances of the applicant or population proposed to be served by the proposed project, including research activities, prevalence of a particular

disease, unusual demographic characteristics, cost-effective contractual affiliations, and other special circumstances and

(5) Special needs related to any research activities, such as participation by the applicant in research conducted by the United States food and drug administration or clinical trials sponsored by the national institute of health, that will be conducted as a result of implementation of the reviewable activity.

{¶ 47} The hearing examiner found appellant did not meet its burden in presenting a preponderance of evidence proving a lack of need for the project. The hearing examiner first noted the instant CON application does not propose the addition of beds to Summit County and the separate CON application referenced by appellant was "not within the scope of review of the case herein" and fell outside of his authority to review. (Hearing Examiner Report & Recommendation at 57.) In making his decision, the hearing examiner considered the occupancy rates among the existing service providers in the service area, population projections indicating an increase of 14.8 percent of those 65 years of age and older, and the proposed project's "promotion of greater numbers of private rooms, both at the source facilities and at the proposed project." (Hearing Examiner Report & Recommendation at 58.)

{¶ 48} Appellant contends Tallmadge failed to provide evidence demonstrating there is a need for the new facility proposed in its CON application in Tallmadge, and, conversely, the testimony and documentary evidence offered by appellant clearly shows the project is not needed. Specifically, appellant points to "unrefuted evidence" that 8 nursing homes exist in the proposed service area with a combined 821 beds, with an overall occupancy rate of 81 percent. (Appellant's Brief at 36.) Appellant additionally asserts that four or five-star nursing homes in the area have a 76 percent occupancy rate equating to 92 unoccupied beds. According to appellant, a 14.8 percent increase in population in those 65 years of age and older does not mean the project is needed considering the low occupancy rates. Appellant believes an increase in private rooms has no bearing on whether the project is needed.

{¶ 49} Tallmadge counters that Ohio Adm.Code 3701-12-20(D) requires the director of ODH to "consider" the need for the project, which the record shows did occur, and there is no reason in this case to second-guess the director's determination. Tallmadge argues

the growing elderly population supports the need for a new 90-bed facility in the service area, and the project which is the subject of this CON application involves the relocation of existing beds from Summit County facilities to Tallmadge and the relocation of beds from semi-private rooms in older facilities to mostly private rooms in a brand new facility. Tallmadge notes Francus admitted that private rooms hold a benefit over semi-private rooms. Tallmadge contends considering the possible addition of 29 beds from outside of Summit County, which is the subject of another separate CON application, is not appropriate here. ODH emphasized that it was appellant, not Tallmadge, who bore the burden of showing at the hearing that the project was not needed by a preponderance of the evidence. To ODH, considering the static number of beds being relocated and the population projections, "[i]t would take remarkable evidence to [appellant] to show that the facility is not needed" and appellant has fallen short of that burden. (ODH's Brief at 17.)

{¶ 50} "Bed need is only one factor to consider in determining a CON application." *Manor Care*, 2005-Ohio-5703, at ¶ 31. In addition to bed need, factors ODH has relied on include population statistics in the service area and beneficial characteristics of the facility. *Id.* at ¶ 31-33; *Progressive Macedonia Real Estate*, 2017-Ohio-8374, at ¶ 30-33; *Parkside Villa*, 2005-Ohio-5699, at ¶ 29-42.

{¶ 51} In this case, the record shows the Tallmadge project is relocating 90 beds from within Summit County, rather than increasing the number of beds in Summit County. We agree with the hearing examiner that any beds that may or may not come into Summit County by way of separate CON applications are outside the scope of this CON application and are more appropriately considered in those separate applications and proceedings. Furthermore, record evidence regarding the increase in population in persons 65 years and older, occupancy rates among existing providers, and the benefit of private rooms support the hearing examiner's conclusion that appellant failed to prove, by a preponderance of the evidence, the project is not needed.

{¶ 52} After review of the record, we find the director's adjudication order, as it pertains to the need for the Tallmadge project, was supported by reliable, probative, and substantial evidence and is in accordance with law.

{¶ 53} Accordingly, we overrule appellant's third assignment of error.

### D. Appellant's Fourth Assignment of Error

{¶ 54} In the fourth assignment of error, appellant contends the adjudication order is not supported by reliable, probative, and substantial evidence and is not in accordance with law because "the Director disregarded evidence of the adverse impact the Project will have on Appellant" and should have denied the application under Ohio Adm.Code 3701-12-20(E) and (J). (Appellant's Brief at 40.) For the following reasons, we disagree.

{¶ 55} Pursuant to Ohio Adm.Code 3701-12-20(E), "[t]he director shall consider the impact of the project on all other providers of similar services in the service area specified by the applicant including the impact on their utilization, market share and financial status." Under Ohio Adm.Code 3701-12-20(J), "[t]he director shall consider the impact of the project on existing staffing levels, if applicable, and the availability of personnel resources to meet the applicant's projected requirements."

{¶ 56} This court has repeatedly noted that any new facility will impact existing providers to some extent and is typically not a sufficient reason to deny a CON application. *Ave. at Aurora*, 2013-Ohio-1145, at ¶ 26, quoting *In re Doylestown Parke Rehab. Ctr.*, 10th Dist. No. 09AP-694, 2010-Ohio-2064, ¶ 15 ("if some impact was sufficient to deny a CON, the few, if any, would ever be approved"); *Progressive Macedonia Real Estate* at ¶ 25 ("Some negative impact, such as retaining staff at [the existing provider], does not require a denial of the CON application."); *Manor Care*, 2005-Ohio-5703, at ¶ 54 ("[N]ursing homes everywhere are faced with the challenge of finding and retaining quality staff. If tight staffing were sufficient to deny a CON application, they apparently all would be denied."); *In re Altercare of Stow Rehab. Ctr.*, 10th Dist. No. 12AP-29, 2012-Ohio-4243, ¶ 22-24 (finding reliance on testimony of challenger of CON application alone to be insufficient to demonstrate adverse impact warranting denial of the CON application).

{¶ 57} Here, the hearing examiner acknowledged the number of beds in the area, the occupancy rate for those beds, and the staffing available support appellant's claims as to some "adverse impact" from the new project. (Hearing Examiner Report & Recommendation at 59.) Thus, we disagree with appellant that the director "disregarded" evidence of the adverse impact the project will have on appellant. (Appellant's Brief at 40.) Moreover, the hearing examiner went on to consider population trends and the fact that the project will not change the total number of beds in Summit County before ultimately

concluding reversal of the granting of the CON application was not warranted due to impact on this record. On our own review, we find the record contains reliable, probative, and substantial evidence to support the director's order adopting the hearing examiner's conclusion as to impact of the project.

{¶ 58} Accordingly, we overrule appellant's fourth assignment of error.

## V.  CONCLUSION

{¶ 59} Appellant's four assignments of error are overruled.  The order of the director of ODH is supported by reliable, probative, and substantial evidence and is in accordance with law.  Therefore, we affirm the order of the director of ODH granting Tallmadge's CON application.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.

_____